The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit.    All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nine and give their attention. For the Court is now sitting. God save the United States and this Honorable Court. All right. Be seated, please. All right. The first case we're going to hear this morning, CPI v. Vivint Smart Homes, and Ms. Thompson, we'll hear from you. Thank you, Your Honor. Elodie Thompson, Quinn Emanuel, Urquhart, and Sullivan, on behalf of Vivint. The $189.7 million jury verdict in this case is unsupported by sufficient evidence. Nothing in the record can justify this windfall to CPI, and at a minimum, this Court should grant a new trial based on the verdict being against the great weight of the evidence. But let me start with the clear legal issues. First and foremost, the District Court erred as a matter of law in not granting judgment to CPI, excuse me, not granting judgment to Vivint on CPI's UDTPA claim. That's because North Carolina law makes clear that a plaintiff bringing a UDTPA claim must assert first-party reliance if it is based on a misrepresentation theory. Well, you know, I understand your argument. You made it below and you made it above, and I don't think it fits anything. If it's based on fraud, the fraud in this case was committed against CPI customers, not against CPI, and so CPI wouldn't be the reliant. The fraud that's discussed is the fraudulent statements made to the customers, and the customers did rely because the allegations they changed. Now, I don't understand your argument that CPI has to rely on it because the fraudulent statement wasn't made to CPI. My suggestion is you go on to your tougher issues. I see just, I'm speaking for myself, I see nothing to that. Yes, Your Honor, just briefly. So in the North Carolina Supreme Court's decision in the bumpers case, there were underlying claims brought by parties who did not have first-party reliance, just like CPI here. I know, but they were fraud claims, directly claimed. CPI doesn't claim it was defrauded. It claims unfair competition because its customers defrauded. Yes, Your Honor. And it seems to me it's basic hornbook law that when there's a misrepresentation, somebody has to rely. But North Carolina's not off base on this. If the case is a fraudulent claim based on the plaintiff relying, there has to be reliance. But this claim is not a claim that CPI was defrauded. This claim is unfair competition because false statements were made to CPI's customers, and the customers relied. Isn't that the argument? That's their argument, isn't it? Yes, Your Honor, that is CPI's argument. But in the bumpers case and in the DC Custom Freight case from the North Carolina Court of Appeals, neither of those were fraud claims. In the bumpers case, it was an overcharging case under the North Carolina statute. This case involves unfair competition, right? Yes, Your Honor. All right. You can continue. Sure. Just briefly, I want to address the unfair competition point, and then I'm happy to move on. On the unfair competition point here, unfair competition was solely based on misrepresentations. That's because in the jury instructions, the court instructed the jury to find liability on the unfair competition claim based on eight misrepresentations or types of misrepresentations that CPI asserted. This is at Joint Appendix page 1859, listing the basis for the unfair competition claim. So even if a broad unfair competition claim that didn't specify the basis— What were the statements made? The statements made were statements made by Vivint sales representatives to CPI customers, right? Yes, Your Honor. Okay. Those fraudulent false statements were made to CPI customers. The law in North Carolina and everywhere else in the United States says that those customers had to rely on it to make it actionable. And the question is, there's no argument that the customers didn't rely on the false statements. Some customers changed because of the false statements. Well, let me address that point briefly because— You can address all of this. You can go on for a while, but I'm suggesting that you're kicking a dead horse. Understood, Your Honor. Just two very quick points. One is that the Court of Appeals decision in D.C. Customs and Freight expressly says,  the holding in bumpers precludes a UDTP claim such that, as in Ellis, in which a third party's reliance caused damage to the plaintiff. End quote. So the North Carolina Court of Appeals has specifically said there can be no UDTPA claim when it's based on third party reliance, unless there is persuasive data that the North Carolina Supreme Court would hold otherwise. Then this court is bound to follow that. But doesn't the statute go back and discuss tortious interference? I understand what you're referring to, like the first part of the statute, but there's a second part of the statute that discusses tortious interference, which the jury in this case found that there was tortious interference with the contract. Yes, Your Honor. Certainly, the jury found tortious interference with seven customer contracts. I don't know how that gets to $29.3 million in damages on the UDTPA claim. But the tortious interference claims, this is on pages eight to nine of the reply brief, the carryover page. All of those customers testified that it was a misrepresentation. It's not as if there was some allegation here that- What about Ms. Joyce Mauricio, I think it's Mauricio, who testified that the Vivint representative did a credit check on her daughter and then ran the daughter's credit without the daughter's permission and then Vivint representative sold her equipment without informing her that it would be taken out of loan from another company. Is that misrepresentation or deception? Well, Your Honor, that's not any injury caused to CPI. Because there's no interaction between- Sure, the fraudulent statements made to the customers caused CPI to lose customers. And they're damaged by that. To me, this is a straightforward deceptive practices claim. You're trying to piece together claims that are- Clearly, if a statement is made to one person and another person brings the action, the other person can't claim it because they didn't rely on it. Your argument is the CPI didn't rely on any false statements. But the whole theory of the case does not involve false statements made to CPI. That's absolutely correct, Your Honor. It involves false statements made to customers. And one of the reasons for the first-party reliance is because here, CPI is claiming that thousands of customers were induced to switch to Vivint from CPI. But there is no support in the record for that. There is no support for even the 565 customers that they say were subject to deceptive trade practices. That's all hearsay. That's all a spreadsheet. There's no foundation for that number. But even then, we go to the 20X multiplier that they used. And that 20X multiplier, there's no basis in the record for it to be anything but speculative. Well, as I understand it, the two experts testified that based on their data and research, 5% of the people complain about problems. And the question is, they had numbers 4.6 to 6 or whatever. But that was their research, and they would say, this is nothing untypical about this one, that they conclude, in their opinion, that only 5% of the people actually made claims. Other people just live with it or go on with it. That's their argument. Now, if their research is flawed, social research, you can address that. But that's the basis for their making that statement, right? First, Your Honor, they did not make that statement. And you don't have to take my word for it. You can go to the record. What did they make then? They said that 5% of the people traditionally complain, and the other 95 don't, right? That is not, Your Honor, what the experts said, no. And I would point the court to Joint Appendix page 1101 to 1102, where CPI's own marketing expert, Dr. Weinert, admitted there is no generally accepted multiplier in either the industry or academic literature. If you look at one page, look at Joint Appendix page 1024. Don't you have to look at what the expert says and what they based it on? Your Honor, I think what both of the experts testified is that there's no way to quantify a multiplier. What CPI could have done is say, based on the evidence we have here, here's what the percentage we think of CPI customers who complained is, and therefore use that. That's not in the record anywhere. Nothing links this multiplier specifically to CPI customers complaining. And, in fact, if you could go to Appendix page 1024, Dr. Weinert testified the estimated rate of customers who complained is a, quote, bit across the map. That cannot be sufficient under this court's case law or North Carolina law to support a damages verdict based on a totally speculative multiplier. Well, let me ask you about that. The parties elected to have general verdicts on the four claims and the $29 million verdict either involves damages to CPI or disgorgement from Biven, right? And we don't know what combination of those two the verdict, $29 million, represents, right? Well, we don't know exactly what the $29.3 million verdict represents. Okay. Absolutely. No, my question is, it includes one of two components, and this was argued to the jury by either disgorgement or damages or both, but not duplicative. They were instructed not to duplicate, right? So, Your Honor, both parties requested that the jury be instructed not to award duplicative damages. Yes, that is correct.  So now the question is, we have to assume on a general verdict, we have to assume that the jury did either one or the other or both. And as you know, disgorgement is not a damage claim. Disgorgement doesn't depend on damage. It doesn't have to be any damage to have disgorgement. It's an equitable remedy that requires Biven to disgorge its ill-gotten gains. Damages to CPI is a damage claim based on lost profit to it. How do we assess a general verdict in this case under any argument? I think if we knew what portion was disgorgement and which portion was compensatory damage, there could be an argument that we shouldn't be including the disgorgement, for instance, in the punitive damage assessment and so forth. But we don't have that information. We have a general verdict. Sure. Well, let me just briefly address a couple issues that I think Your Honor's question raises. And one is the duplicative damages between, on the one hand, the UDTPA claim and, on the other hand, the three underlying claims. Now, North Carolina... Well, let's stay away from that. I'd like you to stick just... Well, go ahead. That's your argument. Yeah, well, I was just going to say, Your Honor, that North Carolina law is clear that you can't recover both the UDTPA damages and damages for the three underlying claims. You may either elect to treble the UDTPA damages or you may recover the underlying claims, the damages on those claims, with punitive damages for those that are eligible. Well, it depends how the jury's instructed on the claim. They were told to award lost profits to CPI or, this is on the state claim, or disgorgement. You both argued for allowing disgorgement. It's a strange remedy, as you know. But they carved out, in awarding the jury, how much marketing expense they incurred that was useless and made that a separate category claim. And how much... In other words, each of those other claims, the jury was told to carve those out, right? Well, again... And not duplicate. We don't know what the jury did in terms of assessing those, but what we do know is that there's a lack of sufficient evidence supporting those damages in the record, and we know that the district court... Let's assume you're right, and the jury said they're back in the conference room and they're sitting there saying, under one of these claims, and they say, well, CPI didn't prove damages adequately. We don't think... But we do believe that Vivint gained profits from its ill-gotten profits, and we're going to disgorge our whole verdict disgorgement. How do you address that? Disgorgement's equitable. You don't need to show the detail that you do. Again, there is an election of remedies required under North Carolina law, and, in fact, CPI was aware of the need to make that election... It's not an election of remedies. You can have both. Disgorgement is not a damage. CPI damage. I mean, your brief is just totally off on the notion of disgorgement. You accept the fact the jury was asked to award disgorgement, but then instead of carving that out in a form, you agreed to a form for a general verdict. Well, again, Your Honor, there were damages awarded for each claim, which makes sense because you have to have damages attributable to each claim. But here, the jury was told, and that's page 1703 to 17... Excuse me. The CPI requested that the jury find liability on the UDTPA claim if the jury found liability on any of the other three claims, and, in fact, that is what the jury was instructed. So the jury had to find liability on the UDTPA claim based on the underlying claim, which means that the verdict form indicated that UDTPA damages, there was a line for that, for traveling, and the other claims were compensatory damages for those claims subject to punitive damages. And let me just address punitive damages very briefly, which is that North Carolina law is clear that the UDTPA damages cannot be included in the cap for calculating damages under North Carolina's punitive damages cap, and that is the Pinehurst case, which specifically says that punitive damages may not be awarded for a UDTPA claim absent legislative intent. That case is a 1986 North Carolina Court of Appeals case. That was 40 years ago, and there is no legislative indication that the UDTPA claim should be incorporated into the calculation for the cap on punitive damages. Thank you. Okay, is that it? You'll be back on rebuttal. Yes, Your Honor. Mr. Walsh, good morning. Good morning, Judge Niemeyer. May it please the Court. The jury heard extensive evidence of Vivint's misconduct, that it trained its employees to bully their way into homes, to mislead or out-lie to customers about their affiliation to CPI, and to persuade those customers to switch services under false pretenses. Faced with that evidence, the jury did exactly as it was instructed. It awarded a distinct amount on each of the four claims for a total compensatory award that was less than what CPI had asked for, but more than Vivint urged. The jury also awarded punitive damages within North Carolina's 3-1 cap. Judge Cogburn then rejected Vivint's many arguments against the verdict in a thorough post-trial opinion, just as Judge Whitney had rejected them at summary judgment. There is no error in this verdict, and we respectfully ask the Court to affirm and welcome the Court's questions. They have only one issue that is subject to de novo review and does not involve deference to the jury or to the trial court's evidentiary rulings. That's the UDPUT issue. It is the case in every state in this nation that if I walk up to a customer's door and I lie to them about who I'm with, that is a deceptive trade practice. What the other side has done is they have plucked a case out of context from a decision of the North Carolina Supreme Court called Bumpers. And in Bumpers, you had customers who were saying, I was lied to by my bank about my account. And the North Carolina Supreme Court said, well, wait a minute. You didn't shop around for the loans. You didn't look at the loan agreement. If you are going to claim that the bank lied to you, you have to show reliance because, of course, for a fraud or a misrepresentation claim, if you are claiming you're the one that got lied to, you have to show detrimental reliance. That's at page 89 of Bumpers. What the other side has done is they've pulled that case out, and they've said, aha, we have a misrepresentation case, hence you have to show first-party reliance, and you don't have it here. The North Carolina Supreme Court in Bumpers was not cutting out the entire class of deceptive and trade practice claims in which instead of lying to your competitor, you lie to their customers or their suppliers or their vendors. Yes, someone has to detrimentally rely. If it's a fraud claim, you have to detrimentally rely. If it's a tortious interference or unfair competition or trademark infringement claim, the customers or the suppliers or the vendors have to rely. North Carolina Supreme Court wasn't trying to overrule the line of its decisions that allow these kinds of claims under UDPA, and they weren't in any way touching this court's cases, cases like Belk, cases like Variety Stores that recognize a garden variety deceptive trade practice claim. I go and I tortiously interfere with your customers. That's their only legal issue. Now I will say, let me ask you the question they raised right at the end. She said that you can't award punitive damages on a deceptive practices claim. So that's not right, Judge Niemeyer. By everybody's accounting here, there were two claims that were subject to punitive damages, the two common law claims, unfair competition and tortious interference. Nobody disputes that those are eligible for punitive damages. We think there's a third claim that was eligible for punitive damages, the UDPA claim, they disagree. But either way, the jury awards $140 million in punitive damages, and it's not asked to assign that to any particular claim. That's their verdict form. We didn't like it, but it was their verdict form, and the judge took it. At that point, the only thing that steps in is the North Carolina statute. If it's within three to one, the punitive damages award is fine. I will say, though, I think the Southwood case is good on this, that if you have an UDPA claim and you don't treble, that untroubled UDPA claim is eligible for punitive damages. Now, you can't do both. You can't treble. Is there a concept of election? Well, yes. The plaintiff can either elect to treble or can elect to have punitive damages on the UDPA claim. Now here, because it's a three to one cap, it doesn't really make much difference. If you sent the case back and we trebled the UDPA claim, you'd come out to almost exactly the same. You'd be at $177 instead of $189. But the point is we didn't treble on the UDPA claim. But my more basic point, Judge Niemeyer, is I don't think it's right to say punitive damages were awarded on that claim. The jury had claims in front of them that were eligible for punitives. The common law claims, nobody disputes that. They award punitive damages. But they did allocate the damages among the four claims. That's right. On compensatories, they allocated among the four claims. That's right. So the guide for punitives was multiple of all four claims, and one of them was the unfair competition claim, a statutory claim. That's right. So you have some punitive eligible claims and you get a punitive award. And then what the North Carolina statute says is you take the amount of compensatories, you look at the amount of punitives, and you ask whether the amount of punitives in the action is more than 3 to 1. And here you add up the compensatories, you add up the punitives. They're within the 3 to 1 cap. My biggest trouble, these damages are quite large, my biggest trouble is if disgorgement was awarded and it had been allocated on the form, I'm not sure disgorgement would have given rise to punitive damages. It's an equitable remedy. But we don't know what percentage of the general verdicts is disgorgement and which is actual damages to CPI. I don't know if there's anything to say. I mean the question is, my question to you would have been, had they allocated one of those elements all to disgorgement, you probably would have excluded disgorgement from the multiple for the punitives. So I think, I actually think you could have punitive damages for disgorgement, but that's a sort of interesting legal question. I just don't see how you get at it here. The parties agreed on jury instructions and no one ever argued that disgorgement wasn't eligible for punitives. The parties argued at the jury? The court instructed the jury on disgorgement? What I'm saying is there was not a word below that said, Judge, you've got to tell the jury they can't award punitives on disgorgement. It is not an argument in the case. Then the jury gets instructed. Both sides agree on the instructions. They say nothing about not awarding punitives on disgorgement. Then we have a general verdict form, which they supplied, which doesn't break it out. So for all we know, it's lost profits, it's goodwill, it's corrective advertising. We have no idea whether the jury awarded a single dollar on disgorgement. I think that's the best argument you can make because I think the punitive cap relates to compensatory damages. Punitive damages are authorized on compensatory damages, and I think it's pretty well established that disgorgement is not a damage. You don't have to have any damage to get disgorgement. But the argument is we don't know what the jury did. We have a general verdict, and it could all be compensatory damages. So I take that point, Judge Niemeyer. I will add one small thing, which is I do think in the context of this North Carolina punitive damages cap, when it says add up all the compensatory damages, I think the best reading of that is damages for harm, and it's not separating out between old remedies at law and remedies at equity. It's saying take the non-punitive part of the case and just ask whether the punitive part of the case is more than 3 to 1 because that's kind of rough justice. We'll just say that's a pretty good measure of what you should be able to get. So I don't think the North Carolina statute distinguishes between legal and equitable remedies in that way. But I'm happy to— Well, not an equitable remedy, but disgorgement is not even a damage. A CPI doesn't have to prove damages. What they have to prove only is that the conduct led to ill-gotten gains, and you're disgorging Vivint of its ill-gotten gains, its profits. But I say all this. It could be totally hypothetical based on what the record is here. So, again, I don't see any way for the court to get out of here. I will say, Judd Nemeyer, I think this is sort of the worst case for that because here the testimony in front of the jury, and it wasn't really disputed, was the average account value for a CPI customer was somewhere in the 3,000s, and for Vivint it was around 4,000. And so they said to the jury, look, just figure out how many customers you think they poached. And then if you want to do the disgorgement, you multiply it by 4,000, and if you want to do lost profits, you multiply it by 3. So there is some delta here between what you would say is a lost profits measure and a disgorgement measure. But it's not a large delta, and it's not the sort of thing that would have swung a damages award hugely in one direction or the other. I mean, we're talking about at the margins, did they pick 3,500 or did they pick 4,100? Again, we don't know because they weren't instructed in any way to separate, and we have a general verdict form. Now, they want to slice and dice by category, but Robinson says you can't do that because you have a general verdict form. So the only question for this court I think that's actually preserved is, was there enough evidence in front of the jury for it to come back with a compensatory damage award of $49 million? And the answer to that is absolutely yes. What's the basis, your understanding of the basis that was given for the 5% figure on making complaints? Sure. So if you look at pages 1023 and 1024 of the Joint Appendix, our expert, Dr. Weiner, who's the deputy marketing chair at the NYU School of Business, he's got a Ph.D. from Carnegie Mellon, he's published about 80 articles on this. He says, look, everybody knows that customers don't complain all the time, right? I had a yard man earlier this week who did a lousy job. I went in and complained to my wife. I didn't call the company. Everybody agreed, both sides, that there is underreporting. The question was, what's the factor? And our expert said, I think 97%, 95%. And then we pointed to the fact that in a separate suit where Vivint was the plaintiff, and this is at page 3287 of the Joint Appendix at footnote 1, we said when Vivint was a plaintiff in one of these cases against an alarm company, it said 25X as a multiplier. It said only 4% of customers complained. So that was our number. They said, we think it's 1 to 2. We think it's more like 1 out of every 2 customers complains. That was a dispute from the experts, classic question for the jury to resolve. Now, as best I can tell, right, we asked for $77 million in compensatories. They gave us $49. As best I can tell, the jury looked at it and said, we're not sure they poached quite as many customers as you think CPI, and we're not sure the multiplier should be quite as high as you think, but probably closer to yours than theirs. And that's where the jury came out. And that is what juries do all the time when faced with competing testimony from experts. They wanted one multiplier. We wanted another. I will say, based on my own experience, I think ours is a lot better. I don't think 1 out of 2 customers calls and complains. But wherever you think it is, that was a classic fact question for the jury. I will note, Judge Niemeyer, they didn't daubert the multiplier. Like, that's not here. They're not saying this expert was not qualified to testify. None of this testimony should have been in front of the jury. They're just here saying they think that multiplier is way off. But that's the province of the jury. It gets to decide what it thought the multiplier was, right? And, look, that was the key question. Did they put in evidence of 1 to 2? They had an expert who was a financial consultant, not a marketing expert, no Ph.D., all the rest. But he said, look, I think it's more like 1 to 2. And we said we think it's more like 1 out of 20. And, by the way, Vivint, when you were a plaintiff, you thought it was 1 out of 25. And we put all that in front of the jury, and the jury made a decision. And, by the way, I think a pretty reasonable decision when you look at it because there was so much testimony from customers saying these guys showed up at the house, they acted like they were CPI, they told me CPI was going out of business, and all the rest. And a lot of those customers didn't ever call to complain. They didn't know about it until this case came along. So we know that there's underreporting. It's a question of how much. That's a jury question at the end of the day. Let me ask you about the Lanham Act because the statute does not discuss punitive damages. It only discusses the compensatory damages. So I'm just curious as to your position regarding the calculation of punitive damages as to the Lanham Act. That's absolutely right, Judge Benjamin. So that's the one claim that both sides agree is not eligible for punitive damages. Now, the jury didn't award punitive damages on that claim. It wasn't instructed it could award punitives. It was instructed it had other claims it could award punitives on. So it awards punitive damages on other claims, and then the North Carolina statute steps in and says, oh, we set a three-to-one cap. Now they say, oh, well, if you roll all the claims into the three-to-one cap, you got punitives on the Lanham Act claim. No, you didn't. The jury didn't award punitives on the Lanham Act claim. The jury awarded an amount of punitives on the other claims, and then the only thing the North Carolina statute says is add up all your compensatories, run a three-to-one against the punitives, and that's how we keep from having runaway punitive judgments in the state of North Carolina. So the only question that I think they've got on the table is when the North Carolina statute says add up all the compensatories, do you do it sort of just claim by claim, or do you add up all the claims, including the Lanham Act claim? And we already know from the North Carolina Court of Appeals in Ryan that the answer to that is you add up all the compensatories. That's how you run the three-to-one calculation. Anything else? All I would say, Judge Niemeyer, is there's a lot of different arguments that have been sort of thrown at the wall on damages. I don't think most of them are preserved because of the way the jury was instructed and the verdict form. I don't think you can slice and dice the categories, but if you do, there was ample evidence in front of the jury for all of these. This was not a runaway jury. This is as bad a case of competitor misconduct as I have ever seen, and they're not here disputing the facts. No one is here saying Vivian didn't do this. This was a jury faced with extensive evidence of some really bad conduct. It entered a compensatory damage amount that was between what the parties wanted, and then it entered a punitive damage amount that was not runaway. It was in the three-to-one cap. This was a jury that acted reasonably based on the record before it. It was within the cap. Was it at the cap or was it below the cap? It's below the cap. No, it's not below the cap by a lot because the compensatories were just under 50 at 49.7, so that would have given you about 149, and they came in at 140. So it's under the three-to-one, but it's close, right? And I think that, like, I don't think that's a problem. In other words, the jury had in front of it egregious misconduct. The jury was perfectly entitled to go right up to the three-to-one cap. They had customers. I mean, not just the customers, right? You had the former vice president of Vivian, Scott Bell, who got on the stand and was asked, when you were at Vivian, what deceptive practices did you see? And here's the quote from the record. Name it, end quote. And then their former employee said, we trained these people to do this. We rewarded the ones who did. He ran through all of it in front of the jury. This was not a runaway jury. This was a jury that said, we're going to award a reasonable amount of compensatories given the harm. We're going to go right up to the cap, but not above, right? You had two good district court judges who looked at the kitchen sink of arguments, rejected them all. Judge Coghran's post-trial opinion, I think, is very thorough and very good on this. This is a verdict that really ought to be affirmed. Thank you. Thank you. All right, Ms. Thompson. Thank you, Your Honor. Let me start where Mr. Wall left off on the punitive damages issue. The jury actually was instructed that they could only award punitive damages if they found liability on the unfair competition claim or the tortious interference claim. That's page 1876 of the record. And that's a correct instruction because those are the only two claims eligible under North Carolina law for punitive damages. If Mr. Wall were correct in his argument, then quadruple damages could be awarded for a UDTPA claim, which is what they're requesting here from this court, that punitive damages be awarded on the UDTPA claim so we're not trebling those damages of $29.3 million. We're quadrupling them. I think what he's arguing is that the damages are not – the trebling is not done claim by claim, but rather as a bucket, so that there's a calculation that's made, and then that's frozen in time, and then the jury can go up to trebling that total amount. And that would be true with regard to the Lanham Act claim just as it would be true with regard to the UDTPA claim. And so it's really just a difference of at what point the trebling calculation is determined, not which claims it's determined on. Well, no, Your Honor, I don't think that's correct. It is which claims are eligible for punitive damages. The court in the Ryan case specifically states that they're talking about claims subject to punitive damages, and CPI concedes in this case that the Lanham Act, which is not eligible for punitive damages, should not be included in calculating the punitive damages cap. Why? Because otherwise punitive damages are being awarded for claims that aren't eligible for them. If you had a breach of contract – Well, it may be subtle, and I haven't thought this out fully, but I think the argument I heard from Mr. Wall was that the punitive damages were awarded on the claims for which punitive damages can be awarded. And then once they're awarded, they're capped based on all the damages. Right, and that's exactly what we're saying is contrary to North Carolina law. And there's a good example. If you have a breach of contract claim, no punitive damages. You get a dollar. What does the statute say? The statute says – I mean, the jury was instructed, as you say, to award punitive damages only with respect to certain claims. And we presume that the jury followed the instructions. Now, the question now is where was the award of punitive damages excessive? Not whether it was awardable, but whether they were excessive in amount. And the North Carolina statute says to look at all the compensatory damages to determine whether it was excessive. This is to satisfy, I guess, the Supreme Court's due process notion about punitive damages. Again, the North Carolina courts, when looking at this issue, have looked at claims that are eligible for punitive damages. That's for the award. For the cap calculation. And that is absolutely what the court says in Rhine, the North Carolina court says in Rhine. And in the case that CPI has cited where they're saying the district court in Southpaw included the UDTPA claims in the punitive damages cap calculation, that's incorrect. That was a magistrate judge's decision that on objections to the district court, if you look at that decision, the district court decision, there are no punitive damages awarded on that UDTPA claim. So there's nothing that CPI can point to in all of North Carolina law awarding punitive damages on a UDTPA claim. This court shouldn't be the first to allow that in calculating the cap. But let me just also briefly turn to the question of the total number of damages. Because there is a great concern here that this is an excessive verdict against the weight of the evidence. And I heard your questions on disgorgement. Let me be clear. What CPI was quoting for the 20 to 1 multiplier is this same page of testimony. It's excerpts of record page 1023. Quote, yes. I mean, as you can see, there's some variation in the studies. You know, some say 95%. Some say 97%. Some say, you know, more than one-third. Takes no action. You know, it's a bit across the map in terms of what the conclusion is. That's what they're relying on to have this multiplier. And why is this important? They're also relying on the fact that in a case in which you were plaintiff, you argued for 4%. But there's nothing connecting any of that admission on a, you know, 25, 30-year-old study in that case to what happened here with these customers. And that's what the jury's award has to be based on. So just taking your question about disgorgement, if we have, say, a 2 to 1. And did you put on testimony that it was 2 to 1? That's right. There was testimony that it could perhaps be 2 to 1. So the fact that there's unreported claims is undisputed. That's true, Your Honor. It's just the amount, right? And it's a swing of tens of millions of dollars. If it were 2 to 1, maximum disgorgement would have been about $4 million. Maximum corrective advertising, 10.8. Maximum goodwill, 13.5. Maximum avoidance of costs, 1.5. What does that total? That totals approximately $25 million. There's no basis to get to a $49.3 million compensatory damages award that then is subject to punitive damages. So for all of those reasons, a new trial should be granted, at least as damages. Thank you. Thank you, Your Honor. We'll come down and greet counsel. Thank you. And proceed on to the next case.
judges: Paul V. Niemeyer, DeAndrea Gist Benjamin, Nicole G. Berner